ROOTED HAIR, INC., Plaintiff-Appellant,

v.

IDEAL TOY CORP., Defendant,

and

A & B Wig Co., Inc., et al., Defendants-Appellees.

No. 194, Docket 27858.

United States Court of Appeals Second Circuit.

Argued Nov. 21, 1963.

Decided March 31, 1964.

Robert W. Fiddler, New York City (Martin G. Reiffin, New York City, on the brief), (Harry Rosenblatt and Arthur T. Fattibene, New York City, of counsel), for plaintiff-appellant.

Maxwell James, New York City (James & Franklin, New York City, on the brief), for defendants-appellees A & B Wig Co., Inc. and A & B Wig Co.

Thomas J. Byrne, Jr., New York City (Keith, Isner, Byrne, Des Marais & Chandler, New York City, on the brief), for defendants-appellees Horsman Dolls, Inc., and others.

Before MEDINA, WATERMAN and MARSHALL, Circuit Judges.

MARSHALL, Circuit Judge:

This suit was brought by plaintiff, assignee of United States Letters Patent Nos. 2,670,570 (issued to Morris Gnaizda) and 2,698,019 (issued to Bernard Sotzky), against the named defendants, for infringement of its patents. The action against defendant Ideal Toy Company was discontinued by stipulation and proceeded against the appellants, who are manufacturers of dolls and doll wigs. The defenses relied upon were, with regard to Gnaizda, anticipation by British patent No. 17,013 to Fairweather, and, with regard to Sotzky, prior invention, knowledge and use by others before Sotzky made his invention and public use more than one year before the date of the application. (35 U.S.C. § 102(a), (b), (g).)

## I

### The Gnaizda Patent

The trial court found that the Gnaizda patent No. 2,670,570, containing a single claim, was wholly anticipated by British patent No. 17,013 to Fairweather, issued in 1908, which contains two claims. The claims of the two patents are set out below.[1] The Patent Office initially reject-

---

1. Gnaizda patent No. 2,670,570:
   "In a doll, a hollow doll head having a base provided with a plurality of perforations, groups of stranded materials simulating human hair extending through said perforations and engaging one an-

ed Gnaizda's application, which then contained ten claims, on the basis of Fairweather. The claims were rewritten into three new ones, which were again rejected. After Gnaizda's attorney requested reconsideration, the examiner ultimately allowed one of the claims, which became the subject of the patent. The chief difference between the rejected claims and the one ultimately allowed is that the latter calls for the looped ends of the stranded material to be "in tight interlocking relationship" and to extend "along the inner surface of said base in a plane generally parallel therewith and forming a continuous chain of linked loops." The court below determined that these distinctions are really no distinctions, because, under Fairweather's teaching, the loops which engage each other would naturally be in a tight interlocking relationship and would extend along the base of the doll's head. At any rate, employing the Fairweather teaching, it would be obvious to one skilled in the art that mere pulling on the free ends of the hair would tighten the loops.

Appellant attacks these findings on the grounds that Fairweather does not in fact call for the same type of stitch as Gnaizda.[2] It relies heavily on the presumption of validity of the patent, strengthened by the examiner's consideration of the allegedly anticipatory reference, and on the fact that the industry did not employ Fairweather's teaching despite its forty years' standing but immediately adopted Gnaizda. See Georgia-Pacific Corp. v. United States Plywood Corp., 258 F.2d 124 (2 Cir.), cert. denied, 358 U.S. 884, 79 S.Ct. 124, 3 L.Ed.2d 112 (1958). But cf. Lorenz v. F. W. Woolworth Co., 305 F.2d 102, 105 (2 Cir. 1962). Plaintiff also argues that the drawings of United States patent No. 1,-000,525 to Kubelka, which it contends relates to the same invention as Fairweather, show that what was contemplated was not the drawing of a loop through a perforation in the doll skull, but drawing one end through the base and then out again, in the manner of a conventional stitch. However, the assertion that the American patent to Ludmilla Kubelka and the British patent to Fairweather (who was administrator of the estate of Josef Kubelka) and one Theodor Friedmann relate to the same invention is not supported. Indeed, the American patent does not disclose that the hair is to be drawn in loop form through the holes in the skull.

The fact that no use was made of the Fairweather invention for many years is not particularly relevant here, since it appears that soft vinyl plastic

---

other in tight interlocking relationship, each of said groups of stranded material having a looped end and a free end, the looped ends of the interlocking groups of stranded material extending along the inner surface of said base in a plane generally parallel therewith and forming a continuous chain of linked loops, and the free ends of said stranded material extending through said base generally perpendicular thereto and being securely locked therein by the interlocking looped ends, said free ends terminating above the surface of said base in a manner to simulate genuine hair."

British patent No. 17,013 to Fairweather:

"1. An improved method of securing natural or artificial hair in pulp, the feature of which is that the hair ends are drawn in loop form through the pulp so that on the inner side or back, hair loops project which are held by a layer of pulp or adhesive.

"2. Embodiment of the method according to Claim 1 characterized by this that the free loops on the back or inner side are looped together before the insertion of the pulp or adhesive for securing them in position, the loop of a later inserted hair being drawn through one or more loops of previously inserted hair."

2. Appellant also complains that these findings, like the others in the court's memorandum, were prepared directly from the proposed findings submitted by counsel for two of the defendants. Although "[t]he findings leave much to be desired in light of the function of the trial court. * * * they are nonetheless the findings of the District Court, and they must stand or fall depending on whether they are supported by evidence." United States v. Crescent Amusement Co., 323 U.S. 173, 185, 65 S.Ct. 254, 260, 87 L.Ed. 160 (1944).

heads suitable for the direct insertion of hair were not developed until 1948. Fairweather intended his invention to be used on heads made of wood pulp before the pulp was fully hardened. However, we believe with the court below that Fairweather's teaching could be applied in connection with vinyl plastic heads suitable for the direct insertion of hair, and that Gnaizda's disclosure does not constitute a patentable advance over Fairweather. It appears from Gnaizda's testimony that the manner of effecting his invention is to use a hook shaped needle which, starting from the inside of the doll's head moves through the skull, engages a strand of hair, pulls the strand through to the inside to form a loop, then moves out again, through another perforation, engages another strand, pulls it into a loop on the inside of the skull and pulls that loop through the preceding loop. This seems to be exactly parallel to what one could do using the teaching of Fairweather's second claim, which in effect describes a chain stitch. Although Fairweather calls for the use of adhesive to secure the hair to the base and Gnaizda does not, if the stitches made in accordance with the former's teaching were pulled tight enough, such adhesive would not be necessary. We cannot accept the view that spelling this procedure out amounted to a patentable invention.[3]

## II

### *The Sotzky Patent*

Sotzky patent No. 2,698,019 relates to an "Attachment for a Post Chain Stitch Sewing Machine Mechanism for Injecting Continuous Hair into a Doll's Scalp and Cutting the Projected Hair," and contains five claims. They differ in some details, but for purposes of this appeal it suffices to set out claim 1, which is representative of all.[4] It will be seen that the critical elements of the suit patent are the presser-foot, designed to hold the head in position for the needle to penetrate; the blade, which cuts the hair material to the desired lengths, and the rotating cross-arms, which carry the hair to the blade, and take it out of the path of the vertically reciprocating needle. The remainder of the machine is admittedly composed of purely conventional elements. Application was filed on September 15, 1953, and the patent issued on December 28, 1954. The judge found that continuous-strand rooting attachments of the type disclosed by the patent were in public use at David & David, a company owned by Gnaizda, in August 1952, and at Sayco Doll Corp. at least as early as July 1952; in both cases more than one year prior to the date of the application. He also found that Sotzky failed to establish a date of invention prior to the filing of his application, and that attachments responsive to the patent claims were invented prior to that date by persons in the employ of David & David, and by Fred Forrest Pease and Daniel Lenoble, who were working for Sayco Doll Corp., and were known, used and sold by David & David, Sayco, Nova Devices Co., Doll Machine Co. (manufacturers of the attachments), Belle Doll

---

3. In view of our conclusions on this phase of the suit, we do not discuss the trial court's alternative ground for concluding that the Gnaizda patent is invalid, i. e., that it failed to disclose a method for making the invention but merely described the product.

4. Sotzky patent No. 2,698,019:
   "1. In an attachment of the character described, the combination with a chain-stitch sewing machine mechanism including a vertically reciprocating hooked needle, a post having an opening through which the needle passes to pierce a workpiece positioned thereupon; of an open-faced substantially channel-shaped presser foot, said presser foot having an upper and a lower horizontal arm, said arms spaced apart and joined at their edges by a vertical member, said lower arm positioned over the needle, an opening therein for the passage of the hooked end of the needle therethrough, a multi-armed rotating member, said member rotating horizontally above the lower arm of said presser foot, means on each of said arms engaging a strand of simulated hair and carrying it along, a stationary blade in the path of said arms, said arms carrying hair to the blade for interception thereby."

Co., Wiggy and A & B Doll Co. (doll and wig manufacturers).

■ Appellant attacks these findings on the ground that no convincing proof existed for the use or invention of continuous hair rooting machines in 1952, more than one year prior to the application, and that the judge erred in ascribing a date of invention later than January 1953. Obviously, the questions involved here are principally factual, and, despite their method of preparation, the judge's detailed findings cannot be set aside unless clearly erroneous. F.R.Civ. P. 52(b). We have, however, made a thorough independent study of the record on appeal and have concluded that the judge's findings are not only not clearly erroneous, but supported by substantial and convincing evidence. Of course, one asserting that a patent has been anticipated by an unpatented device bears a heavy burden of proof, and must come forward with clear and convincing evidence to support his claim or defense. Barbed Wire Patent Case, 143 U.S. 275, 12 S.Ct. 443, 36 L.Ed. 154 (1892); Anderson Co. v. Trico Prods. Corp., 267 F. 2d 700, 702 (2 Cir. 1959). That burden is not an insuperable obstacle, however, and we conclude that it has been met in this case. Smith v. Hall, 301 U.S. 216, 57 S. Ct. 711, 81 L.Ed. 1049 (1937); Helene Curtis Inds. v. Sales Affiliates, Inc., 233 F.2d 148 (1956).

The testimony of Gnaizda, a stockholder in the plaintiff, lends considerable support to the defendants' case. He first engaged Sotzky in 1950 or 1951, to develop a machine whereby hair might be rooted directly to a doll's head. Sotzky developed what has been termed in this litigation a "pre-cut" hair machine. It was basically a conventional Puritan sewing machine, with an attachment which required the cutting of hair fibres to the desired length, their placement in a container attached to the machine, and their insertion into the doll's head by means of a conventional needle. However, his machine proved less than satisfactory, and Gnaizda took it to two mechanics, one of whom was Lawrence Hall, to have it modified. Hall finally delivered a successful machine in early 1952, and later applied for and received a patent on it.

Gnaizda further testified that his company soon changed to a continuous strand machine. He stated that the difference between the Hall pre-cut machine and the continuous machine was that the container for holding the pre-cut hair was removed, and a stationary blade or cutter was installed, to which a rotating disk (found on the Hall machine) brought the strand of hair for cutting to the desired length. This machine would seem to fulfill the same function, in the same way, as the patented invention. It is not disputed that the disk employed on the David & David machine was equivalent to the multi-armed rotating member called for in the patent; indeed, the accused machine in this suit uses a disk arrangement.

As the court noted in its findings, Gnaizda's testimony on when the change to the continuous machine occurred was quite evasive. At the trial, he stated that "some time in 1953, approximately the early part of the year, I changed from the pre-cut to a continuous machine." Records relating to the installation of the continuous strand machines at David & David were subpoenaed but not produced, as Gnaizda stated they had been destroyed. In a patent office interference proceeding between Hall and Sotzky, Gnaizda had stated that the changeover came about the first of the year (1953), and this testimony is in the record of this action. Finally, on his examination before trial, Gnaizda had stated that Sayco Doll and David & David had collaborated in designing a continuous strand machine, and that it was operating roughly six months after delivery of the Hall machines, which was fixed at January to May 1952. Gnaizda also testified that immediately upon installation of the continuous strand machines, they were used for commercial production, and doll manufacturers were aware of the use of the machines.

A 1952 date for the installation of continuous rooting machines at David & David is supported by the testimony of Arthur Boinay, a disinterested witness who was employed in the early part of 1952 as a mechanic for Chandler Sales Co., the New York agency for Puritan sewing machines. Boinay positively stated that he serviced a Puritan machine having a continuous strand hair-rooting feature at David & David in August 1952, just before he took his vacation that year. He drew sketches of the machine which he saw, and as he explained it, it worked in substantially the same way as Gnaizda had testified. Boinay left Chandler on September 19, 1952, and went to work for David & David on September 22. The machine was then in full operation, and was used for commercial production.

Appellant's attack on Boinay's testimony regarding the David & David machine goes only to his credibility. It points out that his story conflicts with part of Gnaizda's, and that he was unable to produce records which he allegedly had kept regarding the exact dates of his employment. Boinay did furnish a statement from Chandler that he was employed by them until September 19, 1952. We fail to see why the court should have been precluded from crediting his testimony.

Defendants also introduced the testimony of Daniel Lenoble, who was also essentially a disinterested witness.[5] Lenoble testified that, while employed at Sayco Doll, he developed in late 1951 a continuous strand hair-rooting attachment that did not have a chain-stitch feature, and was therefore unsatisfactory since hair could be pulled out. One Schoen, owner of Sayco Doll, engaged Fred Forrest Pease, a mechanic from Massachusetts, to correct this deficiency. In May 1952, Pease brought to the Sayco plant a Puritan sewing machine with a hair-rooting attachment that success-fully operated. The machine employed a disk and a rotary knife which cut the hair filament as it turned. It was immediately placed in commercial production. Lenoble made various improvements on this design in the latter half of 1952, which enabled it to cut longer lengths of hair, and designed new versions, one of which used a stationary cutter. Eventually, Schoen decided to patent a machine and an application was filed in October 1953. Lenoble produced certain production records for the various type of machines, including two which showed production of heads on the Pease machine, which employed a chain-stitch, in June 1952. He also produced a head which, he testified, was made in part by the Pease machine in 1952.

Lenoble's testimony is corroborated by Boinay, who stated that he saw a continuous-strand machine in operation at Sayco Doll in July 1952. His description of this machine tallied with Lenoble's. Although plaintiff asserts that the machine had a rotary cutter, rather than a stationary blade, the court found that the two structures were equivalent. We perceive no reason to upset this finding. Gnaizda also testified that continuous strand machines were developed at Sayco at the same time or before the events at David & David.

Appellant challenges Lenoble's testimony on several grounds. It asserts that it was in large part based on an affidavit that was prepared in 1955 and submitted to the Patent Office in connection with the patent application. This affidavit, Lenoble admitted on cross-examination, contained discrepancies, and varied somewhat from his testimony. However, while Lenoble referred occasionally to the affidavit to refresh his recollection on the stand, most of his testimony was independent of it. The trial judge was not required to disregard his testimony because of the variations, especially in

5. Although a patent application was filed in the name of Lenoble and Pease, it was assigned to Sayco and ultimately to the plaintiff. Sotzky, as president of the plaintiff, ordered the application abandoned in 1958. At the time of the trial, Lenoble was a partner in a firm that curled and processed doll hair for use in machines, but was not directly engaged in manufacture or sale of machines.

view of the fact that Gnaizda and Boinay had also stated that a continuous-strand machine was in use at Sayco during this period.

On the whole, we believe the court was justified in finding that machines responding to the Sotzky claims were invented, and in public use, as early as July and August 1952. This is established by testimony of three witnesses, one of whom was adverse to the defendants, one of whom was clearly disinterested, and one of whom had but a slight interest, if any, as well as by considerable documentary proof. Such proof amounts to the "clear and compelling evidence" of which the cases speak. This date would be more than one year before the filing of the patent application, so that the patent is invalid under 35 U.S.C. § 102(b). It is also before the earliest date claimed by Sotzky for his invention, which is late 1952 or January 1953, so that the patent is further invalid on grounds of prior knowledge and invention (35 U.S.C. § 102(a), (g)).

■■ Although it is not essential to go on, we think that the other grounds cited by the court below for its decision on the Sotzky patent should also be sustained. The court found that Sotzky failed to establish a date of invention earlier than the date of his application, September 15, 1953. We note first that the patentee's burden of proof regarding a pre-filing date of invention is as heavy as that assumed by one who seeks to show that the patented invention was anticipated by an earlier device. "When an inventor's date is to be carried back beyond his application, courts regard the effort with great jealousy, and must be persuaded with a certainty which is seldom demanded elsewhere; quite as absolute as in a criminal case, in practice perhaps even more so. * * * It makes no difference how the question arises; whether the patentee is carrying back his own invention, or a supposed infringer is carrying back his; the burden is the same as the proof necessary to establish a prior use." United Shoe Mach. Corp. v. Brooklyn Wood Heel Corp., 77 F.2d 263, 264

(2 Cir. 1935). Another fundamental principle in this area is that a pre-filing date of invention may not be established by the inventor's uncorroborated testimony alone. Thompson v. American Tobacco Co., 174 F.2d 773 (4 Cir. 1949); Oliver Machinery Co. v. Gellman, 104 F.2d 11 (6 Cir.), cert. denied, 308 U.S. 567, 60 S.Ct. 80, 84 L.Ed. 476 (1939).

Insofar as it claims a date of late 1952 for conception, and January 1953 for reduction to practice, that is all plaintiff offered. Sotzky's testimony was that in the fall of 1952 representatives of Wiggy, Inc. approached him to make a pre-cut machine similar to the type he had developed for David & David. While working on this machine, he hit upon the continuous-feeding idea, and told Wiggy that he could make such a machine for them. In January 1953, he got this machine in operation "but it was not ready for delivery because we had a great deal of difficulty with tension and we were working on the mechanism of feeding continuous arrangement through the needle." He had no documentary records of any kind to establish the first building of a continuous strand machine.

On the other hand, Weiss and Alpert, Wiggy's officers, testified that they approached Sotzky only in March or April 1953, and the trial court accepted their version of the facts. Plaintiff points to the fact that Chandler's records showed delivery of a Puritan machine to Wiggy in November 1952, in order to discredit Weiss and Alpert, who testified that they ordered a machine direct from the manufacturer in December 1952 or January 1953. However, that inconsistency doesn't resolve the question of when, after acquiring the machine, they approached Sotzky to have it modified. In fact, Weiss testified that before approaching Sotzky, he himself attempted for sometime to adapt the Puritan machine for purposes of hair-rooting. Nor does Weiss' statement, in answer to a question by the court, that he first saw "the Sotzky machine" in March or April 1953, really aid the plaintiff. This statement may refer only to the previous testimony

that Weiss' company received the Puritan machine which they later gave to Sotzky in March or April 1953. All the rest of Weiss and Alpert's testimony is that they did not see Sotzky's machine used until July 1953.

We believe that the earliest date of conception that may be accorded Sotzky is the date he delivered his first machine to Wiggy—late June or early July 1953. However Weiss testified that this machine, employing the cross-armed structure described in the patent, failed to sew properly, and was given to one Fred Medina, doing business as Nova Devices Co., for modification.

■ Sotzky in June and July solicited and took orders for three other machines or attachments, one of which was delivered on August 17, one on September 17, and one in November 1953. One of the machines employed a multi-armed rotating member like that called for by the patent, two used the slotted disk arrangement found on the earlier David & David and Sayco machines. None of these machines operated successfully, according to the testimony of officers of all of the purchasers. In the absence of contrary proof by the plaintiff, the court was thus justified in holding that the earliest date Sotzky could be deemed to reduce to practice was his application date. With this established, the testimony of Fred Medina becomes relevant. Medina was called as a witness for the plaintiff, apparently to show that he sold a hair-rooting machine to Sayco Doll as late as June 1953. Medina also testified, however, that he developed a continuous strand machine, after being asked to by one Al Kirschenman, which was delivered to Belle Doll Co. on or about May 25, 1953 or before Sotzky's date of conception. Medina was later approached by Weiss, who gave him the unsuccessful Sotzky machine to modify, which he did using the attachment he had developed for Belle Doll.

Kirschenman was evidently a business associate of one Ted Fields, who operated a machinery business under a variety of names, such as Lorraine Toy Co., Doll Manufacturing Co. and Ted Harris. Fields was something of a gray eminence in this litigation, figuring prominently in the testimony of several witnesses but never being called to the stand. His reputation was evidently under some kind of cloud, though this was never clarified. At any rate, according to the testimony of Norman Reich, secretary of A & B Wig Company, Inc., that concern ordered a machine from Sotzky about June 30, 1953 and then, before it was delivered, ordered several machines from Fields' companies, one of which was delivered before September 1. All these events were deemed to constitute prior knowledge, use and sale of the invention before Sotzky made it.

Medina's delivery of a machine by early June to Belle Doll Co. is corroborated by David Pollak, president of still another wig manufacturer. Pollak claimed to have learned of the existence of rooted hair machines in the latter part of 1952, when a customer showed him a head obtained from David & David. Pollak made various inquires with reference to obtaining a machine to root hair, and purchased a Puritan machine in March 1953, delivered about May. He then contacted Sotzky in May or June, and ordered an attachment. But before that, he saw one Harry Gard at Belle Doll Co., who told him that he had a rooted hair machine and that the new method would soon replace the foundation wig. He saw rooted hair wigs at Belle Doll, but Gard did not allow him to see the machine. However, he did give Pollak a disk like the one used on his machine, which Pollak showed Sotzky and then gave back to Gard.

It thus appears from this mass of testimony that continuous rooting machines were developed in at least three places before any date of conception that may be assigned Sotzky; and that by the time he constructively reduced to practice by filing his application, the type of machine covered by the patent was in use throughout the industry. In the light of all of this, the judgment that the Sotzky patent is invalid must be affirmed.

MEDINA, Circuit Judge (concurring):

I concur, but I do not think I should do so without a brief comment on the lack of any opinion below, and the fact that the "documented" findings were prepared by counsel for appellees and were adopted *in toto*, in precisely the form submitted by counsel. While there are courts in which this practice appears to have found some favor, it has been repeatedly criticized in this Circuit, City of New York v. McLain Lines, 2 Cir., 1945, 147 F.2d 393; United States v. Forness, 2 Cir., 1942, 125 F.2d 928, cert. denied, 316 U.S. 694, 62 S.Ct. 1293, 86 L.Ed. 1764; Matton Oil Transfer Corporation v. The Dynamic, 2 Cir., 1941, 123 F.2d 999, and elsewhere, Chicopee Manufacturing Corporation v. Kendall Company, 4 Cir., 1961, 288 F.2d 719, cert. denied, 368 U.S. 825, 82 S.Ct. 44, 7 L.Ed.2d 29.

WATERMAN, Circuit Judge:

I concur in the opinion of Judge Medina as well as in the opinion of Judge Marshall.