**DAVID & DAVID, INC., Plaintiff,**

v.

**Ralph MYERSON, Defendant.**

**No. 61 C 644.**

United States District Court
E. D. New York.

Sept. 29, 1966.

Harry Cohen, New York City (Bailin L. Kuch, New York City, of counsel) for plaintiff.

Frank Nolan and Leo C. Krazinski, New York City (Krazinski & Nolan, New York City, of counsel) for defendant.

## MEMORANDUM

DOOLING, District Judge.

Plaintiff sued for infringement of its Nichols and Garshelis patent, U. S. Patent No. 2,878,514, on an apparatus for curling plastic yarns—such as cellulose acetate yarn or polyvinylidine chloride yarn ("Saran")—to be used as hair on a doll's head. Defendant denied infringement, counterclaimed for a declaration of invalidity, and charged plaintiff with abuse of the patent, unfair competition in sending threatening letters to alleged infringers and contributory infringers, and violation of the antitrust laws in connection with a series of annual contracts under which Celanese Corporation agreed not to sell any 600 denier, 13 filament, fire-resistant yarn, peculiarly suited for doll's hair, to anyone except to plaintiff. It has been concluded that the defendant's device infringed three claims of plaintiff's patent but that the patent is invalid under 35 U.S.C.A. § 103; it has been concluded further that there is no merit in defendant's countercharges of patent abuse, unfair competition and violation of the antitrust laws. Findings of fact and conclusions of law have been separately made.

Historically, doll's hair was made up in wigs which were then glued to the dollhead. When vinyl dolls' heads came into use in the 1950s, it became possible to "root" simulated hair directly in the vinyl heads by use of rooting machines. Pre-curled hair was served to the rooting machines from bobbins or "quills" on which the plastic yarn, simulative of hair, had been permanently curled by heating or wetting. Many inconveniences and cost elements attended winding the bobbins, imparting the curl, storing an inventory of "hairs" of various colors on bobbins, and trying to attain long production runs of curled yarn feeding to the rooting machines from bobbins that could not carry much yarn and could not readily be tied head to tail to lengthen the yarn runs. To overcome these shortcomings the patentees developed their curl making device, and a method of quick-curling the yarn while it passed along the mandrel of their curl making device; the patentees' original application embraced both concepts and it was divided; the patentees obtained two patents, the one in suit on the curl-forming apparatus (No. 2,878,514) and one on the permanent curling method (No. 3,054,015); the latter patent is not involved in this case.

The device of plaintiff's patent No. 2,878,514 forms curls by whirling a hollow tube, through which the yarn passes, around a tapered mandrel. As a loop of curl is whirled around the tapered mandrel, it snares on the mandrel and slides down the mandrel slope in a tightening noose, pushing the next previous loop of curl ahead of it and being pushed by the next loop of curl that is snared on the taper of the mandrel. The patentees' work consisted in organizing familiar machine elements to make the procedure operative. They had to lead the yarn securely and controllably to the point where it could be—in effect—discharged from an eyelet, or a tube end, or some other device that would be whirled around the taper of a mandrel; and they had to support the tapered mandrel in mid-air, as it were, since turns of yarn had to loop continuously around it and pass along its length until removed as completed curls.

They solved the first problem by using to transport the yarn a hollow rotating shaft enlarged at one end into a collar,

mounting the hollow shaft on bearings, and providing belt means for rotating the shaft; through the collar they drilled an escape passage for the yarn, making an angle of about 45° with the shaft, connecting the inside of the shaft with the outside. In the drilled passage they fitted a tube which, when it reached the outside of the collar, was bent and led forward parallel to the shaft and some distance beyond the end of the collar. They thus had a path—the hollow shaft —along which they could securely lead the yarn, and an exit passageway—the tube—through which the yarn could be lead out for whirling around the shaft in a circle considerably wider than the circumference of the shaft or the collar.

The patentees solved the second problem by mounting the wide end of the tapered mandrel on a bearing that rode on the end of the hollow rotating shaft; the mandrel was bent at right angles beyond the end of its taper, and its hanging segment served to prevent the turning moment, applied to the mandrel through the bearing by the spin of the rotating shaft, from spinning the mandrel.

In operation, the device is self-feeding, forms the curls automatically, and progresses them along the tapering mandrel steadily, in uniform sized loops of curl. The centrifugal force of the spin of the shaft and angled tube "throws" the yarn forward and, as it winds on the tapered mandrel, the yarn continues to move forward, evenly; no other force but the spin of the shaft and tube is required to draw the yarn from the feed cone and to keep the curls forming.

The device was eminently satisfactory. It could produce curls continuously and they could be packaged, stored and sold without any bobbins and, as a practical matter, in almost any length. The curl forming machine was a high-speed machine. While the record is meagre on the point, the device appears to have had commercial success. Plaintiff uses about one hundred in its own operation. Plaintiff also leases the devices to seven or eight other firms, who produce a substantial volume of doll-wig curls, but the terms of the leases have not been shown.

Defendant confronts plaintiff with three patents, none of which was cited in the course of the patent prosecution. Two of the patents, those to Faris, No. 2,475,019 and to Rhodes, No. 2,432,935, disclose that the concept of the self-feeding, self-progressing curl forming process achieved through use of a spinning feed to a stationary tapered mandrel was known in the textile and yarn winding field before the plaintiff's patentees made their invention. Neither Faris nor Rhodes used a hollow rotary shaft and angled tube to transport the yarn, but both used stationary tapered mandrels and a spinner or flyer element that whirled the yarn around the stationary mandrel. Neither patent disclosed a complete anticipation of plaintiff's patent, nor do they in aggregate completely anticipate plaintiff's patent. Indeed, even if Whittum, No. 2,700,514, the third patent cited, is added, there is no complete anticipation: Whittum is, moreover, only doubtfully available; it is from the wire-drawing field, and it deals with coiling wire; it plainly presents a hollow rotating shaft and an angled delivery of the wire through two sheaves to a mildly tapered frame block; but Whittum is almost certainly not self-feeding, it is unlikely that its pair of open sheaves would be adequate to transport yarn, and the tapers of its frame block are not certainly curl-forming in any significant sense. But while Faris and Rhodes do not completely anticipate, they leave nothing to plaintiff's patentees that is patentable.

The co-inventor Garshelis considered that the improvements of the device of the patent lay, first, in leading the yarn almost along the axis of rotation and then extending it through a spinning tube to lead it a small distance away from the axis in order to wind it on the conical member (the mandrel), minimizing the breaking and back-winding of yarn when the machine stopped, and, second, in combining two differently tapered conical sections in the mandrel

at the intersection of which the curl would be formed. If the second point is valid, Rhodes, No. 2,432,935, specifically disclosed it. The first point, if not regarded as essentially shown in Faris, No. 2,475,019, or as relevantly disclosed by Whittum, No. 2,700,514, is either not included in Claim 3 of plaintiff's patent, or is included in a form so general that it reads on Faris' arrangement of a horizontally disposed feed cone arranged coaxially with a rotating disc which is pierced eccentrically to form a spinning or rotating passage for the yarn from the stationary cone to the stationary, tapered, coaxially disposed mandrel.

During the prosecution of the patent the applicants urged that they employed a stationary mandrel, not shown in any of the cited references, which allowed of high-speed operation and of making the mandrel as long as necessary for the curl heating and cooling step (to be performed under the method patent). The applicants urged, too, that their device included a transversly extending part to receive the curls from the stationary mandrel. All claims were amended or framed to include a "stationary mandrel." After all claims of the patent were for a second time rejected, and after an interview with the Principal Examiner and the Examiner, all claims were cancelled and the four Claims finally allowed (original claims 24–27) were presented. The argument for allowance first emphasized that provision was made for rotating the spinning member around the longitudinal axis of the tapered member (the mandrel) without rotating the spool of supply yarn. Faris, No. 2,475,019, not cited, disclosed the same provision. It was next urged that plaintiff's mandrel was not rotated but remained stationary during rotation of the spinning member. Faris, No. 2,475,019, and Rhodes, No. 2,432,935, disclose stationary tapered mandrels. And it was contended that the transverse member of plaintiff's mandrel prevented rotation of the tapered member and mandrel. Neither Faris nor Rhodes discloses that

arrangement, but other means of preventing rotating are provided, and Rhodes contemplates lengthening its tapered mandrel "within a wide range."

In support of the newly framed claims, the applicants stated that Claim 1 (original claim 24) and Claim 3 (original claim 26) had been discussed in connection with the discussion of the above stated features of applicant's invention (rotating the spinner and not the spool, stationary mandrel and the stabilizing transverse member) in comparison with the combination of references and that the Examiner at the interview indicated that Claim 1 (original claim 24) and Claim 3 (original claim 26) were allowable. Claim 1 showed, in combination, the longitudinal passage in the shaft communicating with the tube passage through the collar of the shaft (the "spinning member"), and Claim 3 showed no such longitudinal passage, but showed in combination a transverse segment of the mandrel, supported on the shaft by an anti-friction bearing, which was to prevent the mandrel from rotating. Claim 2 (original claim 25) is said to be drawn along the lines of Claim 1, but with greater particularity, and to include the transverse member. Claim 4 (original claim 27) is then said to be drawn along the lines of Claim 3 but to call also for the longitudinal communicating passage in the shaft, which, it is remarked, was specifically defined as a feature of Claim 1. Allowance of the claims of the patent followed.

No argument was made to support the allowance of Claims 1, 2, and 4, on the basis of the significance of the addition of the limitation to apparatus using the longitudinal communicating passage. The argument for the precise claims sought (as distinguished from the argument for the existence of patentable subject matter) was, essentially, that the claims particularized plaintiff's apparatus: "all of the claims define applicant's apparatus, and * * * the apparatus as defined by the present claims would not be produced by the

modification" of the structures shown in certain of the cited prior art patents.

■ Novelty is not claimed for the rotating hollow shaft and communicating tube inserted in the angled passage in the collar of the shaft, and it need not be claimed, provided that the combination has unobvious novelty when the hollow shaft and communicating tube are in union with the other elements of the combinations claimed. But that does not appear. The transition from Rhodes and Faris to the choice of the plaintiff's yarn transport means was obvious to a person skilled in the art. A yarn transport means was indispensable to any winding or curling device, and selection of the particular means used in the device of plaintiff's patent reflected a choice among known means which a person of ordinary skill in the art could be expected to make. The transport means is demonstrably operable, but nothing in the evidence suggests that it does more than adequately perform an operation the performance of which is a presupposition of any curling device, or of any claim drawn to such a device. What the co-inventor Garshelis said is, on this point, as broad as Claim 3 and as broad as Rhodes and Faris, and is not particular to the defined structure of Claims 1, 2 and 4. The transport means defined in Claims 1, 2 and 4 does not enrich the combination of those claims, or help to elevate them to the unobvious. They, and Claim 2 as well, are invalid.

■■ Since the patent is invalid, it hardly matters that the accused device would infringe Claims 2, 3 and 4 if they were valid. It would seem clear from the file history (Cf. Graham v. John Deere Co., 1966, 383 U.S. 1, 32–35, 86 S.Ct. 684, 15 L.Ed.2d 545) that the three claims define a spinning member the external tube outlet of which rotates in a circle around the steep taper of the compound mandrel. But no file wrapper estoppel here precludes resort to the doctrine of equivalents: abandonment of the phraseology of original claims, some of which seem broader and others of which were narrower than the allowed claims on this point, did not arise out of any rejection or threat of rejection of claims because of the breadth or particularity of the language used; the abandonment of the earlier phraseology was not a price paid for allowance of the claims. In the accused device, the protruding tube is omitted, the collar of the rotating shaft is given a sloping face at the side of its adjacency to the wide end of the tapered mandrel, and the slope of the face is exactly that of the taper of the mandrel. But for the narrow gap between mandrel and collar, the two members thus make up a single conical slope or taper. The angular communicating passage from the inside of the hollow shaft of the accused device opens on the sloped face of the collar, but that opening does not, when it spins, rotate in a circle around the steep slope of the mandrel; the yarn, as it emerges, is "thrown" across the narrow gap between the spinning collar and the stationary mandrel and snares on the taper of the mandrel to form curls, functioning just as does the device of plaintiff's patent. Experiment has shown that if the forward projection of plaintiff's spinning tube is shortened so that it does not extend above the taper of the mandrel, the device functions efficiently to form curls. Since defendant's variant accomplishes the same result, by the same work and in substantially the same way as the device of plaintiff's patent, it is an equivalent of plaintiff's design feature. The accused device would, therefore, infringe, if the claims were valid, since in all other respects the claims read on the accused device. See, e. g., Elgen Manufacturing Corp. v. Ventfabrics, Inc., 7th Cir. 1963, 314 F.2d 440, 443–444; Cf. Graver Tank & Mfg. Co. v. Linde Air Products Co., 1950, 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097.

■ Much evidence was addressed to showing that defendant's partner Lenoble had devised a curler that essentially embodied the invention of plaintiff's patent and that Lenoble did it independently of and before plaintiff's patentees made their invention. The

evidence will not support the conclusion urged. Lenoble's efforts to date his device were not successful. He does not claim to have exhibited the device to anyone in the industry until years after the alleged date of invention. Although he knew of plaintiff's device at least as early as 1957 and although he knew of plaintiff's patent in May 1959, he made no claim that he was the first inventor. He made no attempt to file an application for patent on his own account, or to take steps that might enable him to set up an interference with plaintiff's patentees under 35 U.S.C. § 135.

According plaintiff's patentees no earlier a date of invention than their filing date of December 22, 1955, Lenoble's testimony of an earlier date of conception and reduction to practice is fatally uncorroborated (Cf. Rooted Hair, Inc. v. Ideal Toy Corp., 2d Cir. 1964, 329 F.2d 761, 767; Hasselstrom v. McKusick, 1963, 324 F.2d 1013, 1018, 51 C.C. P.A. 1008), and his total failure to disclose his invention, if he had made it, until 1959 would, in any case, very likely have deprived him of any priority of invention as against plaintiff's more diligent patentees. Cf. Gillman v. Stern, 2d Cir. 1940, 114 F.2d 28, 31; Picard v. United Aircraft Corp., 2d Cir. 1942, 128 F.2d 632, 634–635. Defendant failed to sustain the burden of proof on the issue of Lenoble's alleged priority. See Jones Knitting Corp. v. Morgan, 3rd Cir. 1966, 361 F.2d 451; Rooted Hair, Inc. v. Ideal Toy Corp., supra, 329 F.2d at 765; Anderson Company v. Trico Products Corp., 2d Cir. 1959, 267 F.2d 700.

It appears that soon after plaintiff's patent issued, it sent warning letters to several persons, including letters to two customers of defendant, one of whom thereafter desisted from dealing with defendant. Defendant challenges the conduct as damaging unfair competition and as an abuse of patent rights. Plaintiff asserts that it was within its rights in telling purchasers of a product made on an infringing machine that a continuation of purchases after notice of machine infringement would be contributory infringement.

■ The evidence does not make out any abuse of patent rights or other invasion of defendant's interests. Plaintiff evidently proceeded in the good faith belief that it had the rights of suit which it threatened to exercise, and no evidence suggests use of the patent to suppress competition that the plaintiff knew, or should have known, was lawful and non-infringing competition. Plaintiff's conduct was, accordingly, permissible and not actionable. See Kaplan v. Helenhart Novelty Corp., 2d Cir. 1950, 182 F.2d 311, 313–314; Bechik Products, Inc. v. Flexible Products, Inc., 2d Cir. 1955, 225 F.2d 603.

■ The claim of violation of the anti-trust laws fails on the facts. The series of contracts between Celanese Corporation and plaintiff appear to be addressed to a more or less experimental market development program. Plaintiff is the exclusive buyer of yarn from Celanese for doll-wig uses, but it is obligated to take specific quantities and, if it fails to do so, to make good any loss Celanese suffers on sales to others below an agreed on price, which Celanese is to endeavor to obtain. The form of contracting appears to be related to the necessity for having in hand firm business of a certain volume before it could become worthwhile to make up what appears to be a specialized yarn. The contracts require plaintiff to sell yarn to anyone who requests it and has a good credit standing.

Other manufacturers are able to and do offer comparable yarn. The evidence indicates the existence of other makers of curled-yarn for doll-wigs. There is evidence that defendant has, since the plaintiff's patent issued, curled yarn for doll-wigs on a fee basis, working with yarn supplied by its customers.

There is no evidence that plaintiff has a monopoly of doll-wig curling or of supplying acetate yarn for doll-wig uses. There is no evidence that plaintiff has

in any way sought to condition others access to Celanese yarns on a recognition of its patents in order to expand the monopoly of its patents, or has attempted to use its patent rights to force sales of Celanese yarn on others.

On the slender facts shown no inference of illegality can be drawn. Cf. White Motor Co. v. United States, 1963, 372 U.S. 253, 261, 83 S.Ct. 696, 9 L.Ed. 2d 738; F.T.C. v. Motion Picture Advertising Service Co., Inc., 1953, 344 U.S. 392, 73 S.Ct. 361, 97 L.Ed.2d 426; Shell Oil Co. v. F.T.C., 5th Cir. 1966, 360 F.2d 470, 487. Contrast Northern Pacific Ry. Co. v. United States, 1958, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545; United States v. Loew's Inc., 1962, 371 U.S. 38, 83 S.Ct. 97, 9 L.Ed.2d 11.

■ It has been argued that there is no federal jurisdiction over the counter-claim for unfair competition, and that there is an absence of jurisdiction over the antitrust claim because no effect on interstate commerce was shown. The argument in part is rested on the restrictive language of Musher Foundation Inc. v. Alba Trading Co., Inc., 2d Cir. 1942, 127 F.2d 9; Hook v. Hook & Ackerman, Inc., 3rd Cir. 1956, 233 F.2d 180 and Hurn v. Oursler, 1933, 289 U.S. 238, 53 S.Ct. 586, 77 L.Ed. 1148. But the *Musher* case was much weakened in Maternally Yours, Inc. v. Your Maternity Shop, Inc., 2d Cir. 1956, 234 F.2d 538, 543–544, and United Mine Workers v. Gibbs, 1966, 383 U.S. 715, 724–727, 86 S.Ct. 1130, 16 L.Ed.2d 218 has radically altered the test of Hurn v. Oursler. So far as concerns the anti-trust claim, it was put forward under the federal anti-trust law and, if interstate commerce was not pleaded, that went to sufficiency rather than to jurisdiction to decide. Since the claim .has not been supported in fact, it is unnecessary to consider whether to reopen the record to allow proof on the commerce issue.

Accordingly there must be judgment for defendant on the patent issue and for plaintiff on the patent abuse, unfair competition and anti-trust issues.