The **ANSUL COMPANY**, Plaintiff,

and

**Daly-Herring Co., Carolina Chemical Co., Louisville Chemical Co., Food Machinery Co. and Triangle Chemical Co.,** Plaintiff-Interveners,

v.

**UNIROYAL, INC.,** Defendant.

No. 68 Civ. 2244.

United States District Court
S. D. New York.
June 6, 1969.

David H. Pfeffer, New York City, of counsel.

Arthur, Dry, Kalish, Taylor & Wood, New York City, for defendant; Bert J. Lewen, Martin J. Cohen, Steven H. Bazerman, Kenyon & Kenyon, Malvin R. Mandelbaum, New York City, of counsel.

MANSFIELD, District Judge.

In this action for a declaratory judgment initiated by plaintiff Ansul, in which plaintiffs-interveners later joined, plaintiff seeks an adjudication of invalidity, unenforceability and non-infringement of Claims 1 and 7 of U. S. Patent No. 2,614,916 (the "916" patent herein), issued on October 21, 1952 to two scientists then employed by defendant Uniroyal, Inc. (Otto Hoffman and Dwight Schoene) and assigned by them to it, which granted certain claims for an agricultural chemical composition comprising 1, 2–dihydropyridazine–3, 6–dione and its salts [1] ("dione" herein) with a wetting agent, claimed to have the novel property of regulating and altering the growth characteristics of growing plants. The two claims in issue read as follows:

1. An agricultural chemical composition comprising material of the group consisting of 1, 2–dihydropyrida-

Morgan, Finnegan, Durham & Pine, New York City, for plaintiff and plaintiffs-interveners; John A. Diaz and

---

[1]. Chemical compositions may be described either by name or by formula. There are two types of formula designations, empirical and structural. The former discloses only the identity and number of atoms in a molecule, the latter shows exactly where each atom is located within the molecule and how the atoms are bonded together.

One empirical formula may describe several molecules having the same number of the same types of atoms but having distinct properties because of varying arrangement of the atoms within the molecule. Such compositions are known as isomers. The empirical formula for the dione, and its isomers, is

$$C_4H_4N_2O_2.$$

A structural formula, however, by its nature describes a specific molecule. The

dione is represented by the following structural formula:

zine–3, 6–dione and its salts, said composition containing a wetting agent.

7. The method which comprises treating growing plants with material of the group consisting of 1, 2–dihydropyridazine–3, 6–dione and its salts in a concentration and amount sufficient to alter the growth characteristics of said plants.

Ansul also seeks relief under the antitrust laws and misuse of the patent. Uniroyal counterclaims for infringement.

This action arises out of Ansul's entry, in the summer of 1968, into manufacture and sale of an agricultural chemical product previously sold only by Uniroyal, which claimed monopoly rights thereto under its 916 patent. Uniroyal's product has been sold under the names "MH–30" and "Slo-Gro," both of which contain, as their active ingredient, 58% by weight of a substance which was first designated as the diethanolamine salt of the dione and which is now termed the diethanolamine salt of 6–hydroxy–3 (2H)–pyridazinone ("6–hydroxy" herein). Despite the various chemical names applied to this substance throughout the years, it was established at trial that the active ingredient of Uniroyal's commercial product has at all times remained the same: the diethanolamine salt of what is designated as the dione or its isomer, commonly called "maleic hydrazide"[2] ("MH" herein).

Uniroyal exercised its patent monopoly for 15 years in the sale of this product without threat of competition until the summer of 1968 when the Ansul

Company ("Ansul" herein) began to market identical products[3] (called "Sucker Stuff" and "Retard") to be used for identical purposes.[4] Uniroyal then moved to protect its market but was beaten in the race to the courthouse by Ansul.

The issues to be decided at this time are relatively narrow due to counsel's ability to stipulate certain important questions and the fact that trial of all issues other than validity and infringement of Claims 1 and 7 of the 916 patent has been deferred until a later date.

From March 3 to 14, 1969 a separate trial was held pursuant to Rule 42(b), F.R.Civ.P., with respect to the issues of invalidity and non-infringement of Claims 1 and 7. For the reasons hereinafter set forth the declaratory judgment action is granted with respect to Claim 1 and denied with respect to Claim 7, which is determined to be valid and enforceable, subject to resolution of the antitrust and misuse issues by trial scheduled to commence in 1969.

*Background of the 916 Patent*

MH, the active ingredient of the compound which is the subject of the 916 patent, dates back to 1894, when the published dissertation of a German doctoral candidate in chemistry, Hans Foersterling, disclosed the preparation of a chemical compound designated therein by the structural formula for the dione from maleic anhydride and hydrazine. One year later a modified version of this dissertation appeared in an article co-authored by Foersterling and his professor, Dr. Th. Curtius.[5] In this work the

---

2. Maleic hydrazide is referred to as a common name because, unlike most chemical names, it does not reveal the chemical structure of the named compound. Generally there is a correlation between a structural formula and a chemical name. For example, a chemist learning that a compound is referred to as 1, 2–dihydropyridazine–3, 6–dione would be able, without further information, to draw the structural formula for that compound which is shown in fn. 1.

3. The labels for Ansul's products indicate that, like Uniroyal's MH–30 and Slo-Gro, the product consists of 58% 6–hydroxy.

Further, Ansul's labels, like Uniroyal's, refer to the active ingredient not only by a chemical name indicating structure, but by its common name, maleic hydrazide.

4. The labels of Uniroyal's MH–30 and Ansul's Sucker Stuff indicate that both are to be used to prevent the growth of tobacco suckers and the sprouting of potatoes and onions. The labels of Uniroyal's Slo-Gro and Ansul's Retard indicate that they are to be used to control the growth of grass, trees, shrubs and ivy.

5. Curtius and Foersterling, J.Pr.Chem. (2) 51, 371–398 (1895).

compound which Foersterling had designated by the structural formula for the dione was given the name "maleic hydrazide." No use was suggested for the newly disclosed chemical, and it remained virtually unmentioned in the literature for over 50 years.

In 1947 two employees of defendant Uniroyal, Inc. (then known as United States Rubber Company), Otto Hoffman, a biologist, and Dwight Schoene, a chemist, were conducting joint experiments with various chemicals on tomato plants.[6] The chemist, Schoene, prepared a compound which he later discovered had been previously disclosed and named by Foersterling and Curtius as maleic hydrazide. This compound, as well as its copper and zinc salts, was applied in a mixture or composition with a wetting agent to the test plants. Two to three weeks later, in December of 1947, it was observed that the chemical had dramatically inhibited the growth of treated tomato plants without injuring them. The plants were observed to be from 30% to 50% smaller than untreated "control group" plants, yet the treated plants appeared to be healthy and normal in all other respects. While other chemicals existed that would inhibit the growth of plants, the discovery that MH could accomplish this result without injury to the plant uncovered a new and unique property offering prospects for possible practical use. Prior to that discovery, although some other compounds had been found that would inhibit plant growth, they also caused plant injury that rendered them of little or no practical use.

In a report dated January 22, 1948, Dr. H. Douglas Tate, Uniroyal's manager of agricultural chemicals research and development, reported under a heading "Herbicides" that the recently tested re-

action product of maleic anhydride and hydrazine hydrate (MH) "prevented all development of terminal and lateral buds of plants without any other apparent injury." Thereafter, Uniroyal began testing the chemical on other plants in the greenhouse and in the field, including vines (squash), weeds and grass. In September of 1948 Hoffman, the biologist, wrote the chemist, Dr. Schoene, and informed him that MH's growth inhibition effect was unique and that sufficient information had been accumulated to merit a patent application. As a result of the experimentation conducted at Uniroyal, the inventors described MH's property of inhibiting plant growth as generic. A paper prepared by them in the winter of 1948–1949 (Ex. O) for distribution to numerous experimental stations that would be asked to test the compound on various kinds of plants, described MH as "A UNIQUE GROWTH REGULANT" found to have a "pronounced, but temporary, inhibiting effect on plant growth," without suggesting any limitation to specific species. Although the paper gave details as to their experiments with tomato plants and grass, the authors indicated their belief that it could be used to inhibit growth of plants generally, as follows:

"Trials of this chemical are suggested wherever it is desirable to temporarily inhibit the growth of plants. Such uses include the temporary inhibition of grass growth on lawns so as to reduce the number of mowings; the inhibition of shrubs so as to reduce the amount of trimming; the inhibition of growth in permanent plantings such as nurseries, raspberry plantings, and others."

At approximately the same time, in a report dated October 1, 1948, Dr. Tate

---

6. Tomato plants were the standard plants used by Uniroyal for screening new chemicals. It was also common in such tests to use a wetting agent with the chemical to be tested. A wetting agent, or surface active agent, is a substance capable of reducing the surface tension of a liquid solution, and it was and is commonly used in the application of chemical systems to plants to permit spreading of the solution on the surface of the leaf so as to aid penetration and absorption of the chemical.

reported the results of Uniroyal's most recent experimentation as follows:

"*Plant Growth Inhibition by Maleic Hydrazide*

"Maleic hydrazide has prevented growth of lawn cover for more than one month without killing any plants or causing any apparent effect other than growth inhibition. Although no practical applications are apparent at the moment, its marked effect in controlling plant growth indicates that a useful application might be found for it or related compounds."

Thus, to summarize the status of Uniroyal's invention as of the beginning of 1949, its scientists had discovered that MH possessed a remarkable new quality and use, up to that point unknown and unappreciated, which was described in generic terms as enabling a person to arrest the growth of a plant temporarily. The basic new utility of the chemical was clear. On the other hand, further experimentation would be required to spell out the details of its use on specific plant species (i.e., to determine the most suitable dosage rates, wetting agents, concentrations, timing, and salts for each of the many varieties of growth forming the plant kingdom). Although various kinds of practical use were visualized, commercial possibilities had not yet developed. It is undisputed that if Hoffman and Schoene had not discovered the compound's unique property of plant inhibition, it might never have become known or available to mankind.

Before seeking the reward of a patent monopoly for the new discovery Uniroyal, in late February or early March of 1949, began to "sample" [7] MH to independent research personnel who were known to be interested in the areas in which Uniroyal felt practical application of the chemical's newly discovered use might be developed. Each person asked to test the new compound was informed for the first time of its newly discovered property through a copy of the inventor's article entitled "MALEIC HYDRAZIDE, A UNIQUE GROWTH REGULANT" by Hoffman and Schoene. As a result of this sampling, the current major commercial uses of MH were developed. Dr. Aubrey Naylor, a professor of botany at Duke University with vast experience in the area of growth substances, was impressed with the claims made for the sample of MH and decided to have his undergraduate class run simple tests with the chemical to see whether it would be effective in preventing the suckering [8] of tobacco. Guided by the directions sent with the sample and his past experience as a plant physiologist, Dr. Naylor found that the chemical was effective in preventing tabacco suckering, which would save tobacco farmers from the time-consuming task of manually removing suckers and which has been described by one tobacco farmer as "almost a miracle." This application of the basic discovery has also accounted for most of Uniroyal's success in marketing MH for commercial use.[9]

7. It was a common practice for manufacturers of agricultural chemical compounds to send samples to workers at government sponsored Agricultural Experiment Stations and elsewhere for testing or "sampling." In the case of the sampling of maleic hydrazide Uniroyal either preceded, followed or accompanied the shipment of the chemical sample with a short description of the chemical and directions for its testing which were based on early experiments by Uniroyal.

8. The suckering of tobacco occurs when the axillary buds (found at the point of insertion of the leaf on the main branch of the plant) begin to grow. This lateral branch, or secondary growth on tobacco,

is referred to as a sucker. The formation of suckers on tobacco plants is undesirable because the growing suckers utilize the essential metabolites which normally go to the growth of the leaves, the agricultural end product of tobacco plants, and this diversion lowers the grade and quality of the leaf. Prior to Dr. Naylor's tests and Uniroyal's subsequent marketing of maleic hydrazide, tobacco farmers had to remove suckers manually, which was costly.

9. The parties have stipulated the commercial success of Uniroyal's MH products. Since its commercialization by defendant in the early 1950's more than $68,000,000 of MH and its salts has been marketed

The other major commercial use for MH is the prevention of sprouting of stored potatoes and onions, which stems from the work of Dr. Sylvan Wittwer, an Assistant Professor of Horticulture at Michigan State University, to whom a sample of MH was sent by Uniroyal as part of its sampling program. Dr. Wittwer had been looking for a chemical that would prevent onion sprouting and the description sheet sent by Uniroyal with the MH sample indicated to him that MH might be effective for that purpose. Using the instruction sheet and his skill and experience, Dr. Wittwer, in one experiment, not only found that MH was effective for this purpose, for which no other solution had been found, but also determined the optimum concentration, rate and timing of the application of the chemical to onions. Since that one experiment nothing significant has been added to man's knowledge concerning the use of MH on onions.

While these and other tests were being conducted with the chemical, Hoffman and Schoene on April 1, 1949, as assignors to Uniroyal, applied for a patent which would basically cover the chemical and its salts combined with a wetting agent, and the use of the chemical and its salts to temporarily inhibit the growth of plants. Although Dr. Tate, in his January 1948 Summary of Progress (Ex. S), had reported on MH under the heading "Herbicides," [10] indicating the possibility that it might become useful as a plant killer, or phytocide, the original patent application filed on April 1, 1949 did not disclose such use, but was limited to temporary inhibition of plant growth. Shortly after the filing of the original application, however, MH's phytocidal ac-

tivity was recognized by Dr. Hoffman as a result of tests on grass plots (Ex. BQ, dated April 19, 1949). This was confirmed by another independent researcher to whom an MH sample was sent, Prof. A. S. Crafts of the University of California, who found that certain grasses were killed as a result of his treatment of them with MH prior to May 20, 1949. On July 20, 1949, a continuation-in-part application was filed, disclosing among other things, MH's phytocidal activity. After several amendments the patent which is the subject of this suit, Patent No. 2,614,916, was issued on October 21, 1952.

*Basic Principles and Contentions*

 To be patentable either as a composition (Claim 1) or a method (Claim 7), the claimed invention must, *inter alia*, be new, useful and not obvious to those having ordinary skill in the art to which the subject of the claimed invention pertains. 35 U.S.C. §§ 101 and 103; Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1965). The fact that an invention claimed herein was the consequence of a routine screening process does not affect its patentability. 35 U.S.C. § 103. A patent is invalid if the subject matter of the patentee's invention was known, used, made or conceived by another in this country prior to the patentee's invention thereof, provided that if there was a prior inventor he did not abandon, suppress or conceal his invention. 35 U.S. C. § 102(a) (g). But even if the invention meets these tests, a patent may be held invalid unless it complies with the disclosure and claiming provisions of 35 U.S.C. § 112 [11] which were designed

for use in treating plants. Use for control of tobacco suckering has accounted for approximately 75% of Uniroyal's sales of MH. Though MH had laid dormant for over 50 years, once Uniroyal disclosed its unique effect on plants and sampled the chemical to those interested in plant growth regulants and herbicides, discoveries of new uses and published articles appeared with great frequency. By 1963 at least 1,000 articles had been written about MH, which indicates that

Uniroyal's discovery opened up a substantial field of scientific endeavor.

10. A herbicide is a chemical capable of killing herbaceous, or soft tissued plants such as grasses and tomato plants. Herbicides are included in the class of plant killers known as phytocides.

11. In pertinent part 35 U.S.C. § 112 reads:

"The specification shall contain a written description of the invention, and of

to require the patentee, in consideration for the grant of a patent monopoly, to disclose his invention to the world with sufficient precision to enable those skilled in the art to practice it, and to distinctly claim the subject matter of his invention so as to not discourage enterprise and experimentation "by the creation of an area of uncertainty as to the scope of the invention", which might have the effect of broadening the statutory monopoly beyond the scope of the actual invention. Georgia-Pacific Corp. v. United States Plywood Corp., 258 F. 2d 124, 137 (2d Cir.), cert. denied, 358 U.S. 884, 79 S.Ct. 124, 3 L.Ed.2d 112 (1958). In determining whether there has been compliance with § 112, however, due consideration must be given to whether the subject matter in a particular case is of a nature that lends itself to precise definition, and allowance must be made for inherent imprecision in language as a means of such definition.

Ansul and plaintiffs-interveners urge that Uniroyal's patent claims are deficient for one or more of the above reasons. Specifically, Claim 1 is attacked as being unpatentable over the prior art because it lacks novelty and was obvious and because it does not comply with the claiming provisions of 35 U.S.C. § 112. No attempt is made to argue that Claim 7 is obvious or not novel, but it is urged that Claim 7 meets neither the disclosure nor claiming provisions of 35 U.S. C. § 112 and that it is invalid because of prior and intervening inventions of scientists who were sent samples of the product by defendant prior to the initial filing of its patent application.

■ These contentions must be investigated in light of the admitted commercial success of this product and the fact that despite that success no one challenged defendant's patent monopoly

until Ansul entered the market in 1968, approximately 1½ years before the expiration of defendant's patent. Public acquiescence in the validity of a patent for some 15½ years, particularly when that patent, as here, protects an extremely profitable market, is a significant factor tending to show validity, at least in a doubtful case and in the absence of other explanatory circumstances. See Georgia-Pacific Corp. v. United States Plywood Corp., 258 F.2d 124, 133–134 (2d Cir.), cert. denied, 358 U.S. 884, 79 S.Ct. 124 (1958); Consolidated Car Heating Co., Inc. v. Chrome-Gold Alloys Corp., 109 F.Supp. 652, 654 (N.D.N.Y.1952).

■ Normally a presumption of validity attaches to an issued patent, in recognition of the expertise of the Patent Office which allowed it, particularly where, as here, the Patent Office was fully aware of the prior art. Georgia-Pacific Corp. v. United States Plywood Corp., 258 F.2d 124, 132, 133 (2d Cir.), cert. denied, 358 U.S. 884, 79 S.Ct. 124 (1958). Back in the days when Patent Office personnel had adequate time to review and consider each application in the light of prior art, such a presumption was entitled to considerable weight. With the steady and massive increase in the number and type of patent applications, representing a fallout from industry's sharply increased research activities, it is unrealistic to attach any great weight to the allowance of a patent by an overworked staff. See Graham v. John Deere Company of Kansas City, 383 U.S. 1, 18, 86 S.Ct. 684 (1966). In any event, such a presumption in the present case is further weakened, if not destroyed, by the discovery, since the institution of this lawsuit, that erroneous data with respect to significant aspects of experiments with salts was submitted in Example VIII of the patent application.

the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode con-

templated by the inventor of carrying out his invention.

"The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention. * * * "

Although Uniroyal contends that the Patent Office would have relied upon the false data only in connection with its allowance of Claims 12 and 13 (which Uniroyal abandoned on the eve of trial), this is sharply disputed by Ansul. In view of these circumstances we have decided, in resolving the issues before us, not to give any weight or attach any presumption of validity to the issuance of the 916 patent. See Floridin Co. v. Attapulgus Clay Co., 35 F.Supp. 810, 814 (D.Del.1940); affd., 125 F.2d 669 (3d Cir. 1942); and California Research Corp. v. Ladd, 123 U.S.App.D.C. 60, 356 F.2d 813, 819 (1966).

*Claim 1*

The patent, being for a chemical composition to be applied to plants, is directed to those skilled in the art of plant physiology. Though not necessarily chemists, the plant physiologists to whom this patent would be directed would be presumed, of necessity, to have substantial skill in the art of chemistry. In determining whether this claimed patentable invention presents a sufficient advance over the prior art, this Court must place itself in the position of those persons to whom the patent was directed, and project itself back to the late 1940's when the claimed invention was made.

Ansul argues that Claim 1 was not novel because the 1894 publication of Foersterling discloses the dione and a wetting agent. See 35 U.S.C. § 102(a). Uniroyal does not dispute that a prior disclosure of the composition claimed in the patent will invalidate Claim 1, nor

does it dispute the prior disclosure of the dione. Its position is that Foersterling's publication did not disclose the use of the dione *with a wetting agent.*

Although the Foersterling dissertation discloses the use of the dione with ethyl alcohol and benzaldehyde, both of which have properties of wetting agents (see footnote 6), it did not combine them with the dione because of their wetting agent properties. Furthermore, benzaldehyde and ethyl alcohol would not be effective as wetting agents unless used in very large amounts, and for that reason are not, as a practical matter, regarded as effective wetting agents in the field of plant physiology. For these reasons one skilled in the art would not regard Foersterling's disclosure to be within the art's understanding of the patentee's disclosure in Claim 1 of "An agricultural chemical composition comprising material of the group consisting of *1, 2 dihydropyridazine–3, 6–dione* and its salts, said composition *containing a wetting agent."* (Emphasis added.)

■ The evidence amply demonstrated that benzaldehyde and ethyl alcohol would not be efficient wetting agents, nor likely ones to use for agricultural purposes.[12] As claims are to be construed in light of the specifications, United States v. Adams, 383 U.S. 39, 49, 86 S.Ct. 708, 15 L.Ed.2d 572 (1966), we need not ignore the specifications of the patent which disclose wetting agents that are both efficient and compatible with uses in agriculture. Therefore, we need not blindly find a lack of novelty on the

12. Plaintiff's chemical expert, Dr. Wagner, testified that Foersterling did not use ethyl alcohol with the dione as a wetting agent but rather for the selective separation of a reaction product. This same witness testified that Foersterling did not mix benzaldehyde with the dione to study surface tension, but to investigate the properties and reactions of such a mixture. Dr. Wagner also noted that example 2 of the 916 patent disclosed the use of emulphor as a wetting agent and that he would expect that as little as one part emulphor to 40,000 parts water (weight ratio) would substantially lower

surface tension. On the other hand, he did not think that you could measure the minute reduction in surface tension that would occur if ethyl alcohol were mixed with water in the same proportion. All experts stated that normally if a wetting agent were to be used one would select an agent that would be effective when used in small amounts. Dr. Wagner testified that benzaldehyde is toxic to humans, and Dr. Hall, plaintiff's plant expert, testified that alcohols were not normally used as wetting agents in the agricultural field.

ground that Foersterling's combination of the dione with something which can theoretically, but not practically, be described as a wetting agent anticipated Claim 1 of the patent. See United States v. Adams, *supra* at p. 50, 86 S.Ct. 708.[13]

The absence of a prior disclosure of the elements in combination does *not necessarily render the combination* patentable. For a combination of known elements to be a patentable composition "[t]he conjunction or concert of known elements must contribute something; only when the whole in some way exceeds the sum of its parts is the accumulation of old devices patentable." Great A & P Tea Co. v. Supermarket Corp., 340 U.S. 147, 152, 71 S.Ct. 127, 130, 95 L.Ed. 162 (1950). Further, the combination of the two old elements must not have been obvious to those skilled in the art prior to the date of invention. Claim 1 meets neither of these tests.

It is undisputed that the dione and wetting agents were old elements well known to the prior art. The dione was combined with a wetting agent simply as a part of a routine screening test. It was common practice as early as 1946 for Uniroyal and others, when screening new chemicals, to mix them with a wetting agent. As the combination was obvious to the prior art, it is not a patentable composition. Uniroyal argues that the use of a wetting agent with the dione did not become obvious until its scientists discovered that the dione can serve some purpose when applied to plants. But the addition of a wetting agent does not require recognition of a compound's use as an "agricultural composition." Wet-

ting agents are commonly used in many fields, for many purposes. Application of Riden, 318 F.2d 761, 766, 50 CCPA 1411 (1963); Application of Lemin, 326 F.2d 437, 439, 51 CCPA 942 (1964).

Even if the combination were not obvious, the same result would follow from the undisputed evidence that, in combination, the dione and a wetting agent each is limited to performing the same function which it always has performed independent of the other. The dione is the active ingredient that affects the plant and it performs its independent function of altering plant growth even when applied as a solution in plain water without addition of a wetting agent. The wetting agent merely increases the spreadability of the dione and its absorption into some plants. It does not, however, make the dione any more active. Thus it simply performs the same function that it would perform if used with any other chemical in solution. As the whole of this combination is no more than the sum of its parts, Claim 1 is not patentable. Continental Can Company v. Old Dominion Box Company, 393 F.2d 321, 326 (2d Cir. 1968).

*Claim 7—Indefiniteness of Claiming and Disclosure*

Ansul does not deny that Claim 7, which claims a new method or use for the dione, i.e., "to alter the growth characteristics of said plants," is a wholly novel, useful and unobvious use for the compound, which was properly the subject of patentability. However, Ansul contends that the patent's disclosures relating to Claim 7 fail to meet the requirements of 35 U.S.C. § 112 because

---

13. Plaintiff refers to Old Town Ribbon & Carbon Co. v. Columbia Ribbon & Carbon Mfg. Co., 159 F.2d 379, 381–382 (2d Cir. 1947) and Application of Shackell, 194 F.2d 720, 727 (C.C.P.A.), cert. denied, Shackell v. Marzall, 343 U.S. 978, 72 S. Ct. 1076, 96 L.Ed. 1370 (1952), as support for its contention that a prior disclosure of a composition, even if inadvertent, will preclude the patentability of that composition. Those cases are distinguishable in that the prior disclosure relied on in those cases was "complete

and adequate." "[O]bviously one is not the first inventor if, as was the case here, somebody else has made a *complete and adequate* description of the thing claimed before the earliest moment to which the alleged inventor can carry his invention back." Alexander Milburn Co. v. Davis, Bournonville Co., 270 U.S. 390, 400, 46 S.Ct. 324, 70 L.Ed. 651 (1925) (emphasis added). The holding here is that Foersterling did not completely and adequately disclose the use of the dione with a wetting agent.

they do not furnish sufficient information to enable one skilled in the art involved to practice the invention. It is also contended that Claim 7 is couched in such broad general terms that it amounts to invalid overclaiming.[14]

As Ansul sees it, the patent discloses but a paltry few examples of experimentation with MH on a single variety of tomatoes, corn and peas, a few weeds and some grass; it then proceeds to make claims encompassing the entire plant kingdom of at least a half million species without disclosing what operative effect MH will have on different plant species, the timing, dosage rate, and concentration required for treatment of each, the types of salts and wetting agents that should be used and the operative effect of each. The result, according to Ansul, is merely to invite those skilled in the art to engage in broad, extensive and time-consuming experimentation in order to determine which plants are temporarily inhibited by MH, which are killed, which remain unaffected or even stimulated to more growth, and what concentration, dosage rate, salts and wetting agents are to be used to obtain specific results. All of this blind experimentation, argues Ansul, must be conducted without even the aid of bellwethers in the patent disclosures. In short, Ansul contends that the patent amounts to a mere hunting license proscribed by § 112 rather than a certain guide to practice of the generic invention claimed.

In reply Uniroyal asserts that Claim 7 is broad and generic for the reason that the invention represented a basic or pioneer discovery, wholly new to the art, as distinguished from a minor improvement in a crowded art. Uniroyal concedes that before determining how MH may be used most effectively upon a particular species or variety some experimentation is required to establish the optimum timing, concentration, dosage rate and type of wetting agent, since, as the patent itself states, "[t]he concentration of the chemical in the inert medium depends upon the effect desired, the time of year, the age, species and variety of plant, the climatic conditions, etc." However, contends Uniroyal, Ansul grossly exaggerates the scope and type of such experimentation, and underestimates the learning already possessed by those skilled in the art, which would enable them, with the teachings imparted by the specification, to practice the invention with minimal experimentation.

Uniroyal further points out that the patent discloses MH's effectiveness upon the two major classes of plants, the broadleaf and narrowleaf; and it identifies various salts, wetting agents and examples of plants, and MH's effectiveness upon them, which has enabled those skilled in the art to secure the claimed results in very short order. Such routine experimentation has further revealed that despite some initial impressions that MH might be ineffective upon certain types of plants, it actually affects all plants. The fact that certain salts or wetting agents are inoperative, Uniroyal asserts, would be known to those skilled in the art.

Lastly, Uniroyal poses the practical dilemma in which it found itself in seeking the 916 patent. It would be impossible, or at least prohibitively expensive, and would require many years to test the many thousands of plant species suggested by Ansul as a condition to the award of a broad method claim such as No. 7. If, on the other hand, the inventors had been required to narow the claim to the few plant species or varieties already tested, the invention, which is essentially generic in nature, would become freely available to the public for practice with respect to the many thousands of other species and varieties forming the plant kingdom, with

---

14. The term "wetting agent" is attacked as being too broad but as it appears only in Claim 1 it is dealt with in the text primarily by analogy. But for purposes of review it should be clear that if Claim 1 were to be held unobvious, and therefore valid, this Court would not find that the use of the term "wetting agent" destroyed that claim's validity.

the result that Uniroyal would be deprived of adequate patent reward for a basic invention made by its scientists.

We turn to a few additional principles by which we must ourselves be guided in the application of 35 U.S.C. § 112. In construing and applying that section, two countervailing policies have been recognized as entitled to consideration. On the one hand, the inventor must be encouraged to disclose and teach his discovery for the public's benefit. Toward this objective the statutory monopoly must be commensurate with the scope of his invention. On the other hand, further research and experimentation in the same general area must not be inhibited. If the claims of the patent are permitted to exceed the invention, or to create an area of uncertainty as to its scope, experimentation by others may be discouraged.

Faced with the task of balancing these opposing interests, we find it of little use to resort to oft-quoted broad generalities, frequently expressed in colorful catch-phrases.[15] Experience reveals that in practice these truisms are expanded or contracted, like an elastic band or a fireplace bellows, to suit the nature of a particular patent's subject matter and the novelty and scope of the discovery disclosed. When confronted with an invention that amounts to a minor improvement in a crowded art we have stringently enforced the requirement for precise delineation and kept a tight rein upon the slightest tendency toward overclaiming, e. g., Universal Oil Products Co. v. Globe Oil Refining Co., 322 U.S. 471, 64 S.Ct. 1110, 88 L.Ed. 1399 (1944). On the other hand, a more liberal attitude had been exhibited toward a patent disclosing a pioneer or generic invention, which has

been defined as "a patent covering a function never before performed, a wholly novel device, or one of such novelty and importance as to mark a distinct step in the progress of the art, as distinguished from a mere improvement or perfection of what had gone before." Westinghouse v. Boyden Power Brake Co., 170 U.S. 537, 562, 18 S.Ct. 707, 718, 42 L.Ed. 1136 (1897). The latter is entitled "to a liberality of construction which would not be accorded to an ordinary improvement upon prior devices," Westinghouse v. Boyden Power Brake Co., supra, and "If the matter were doubtful, it is plain * * * that the character of the patent and its commercial and practical success * * * entitle the inventor to broad claims and to liberal construction of those which he has made." Smith v. Snow, 294 U.S. 1, 14, 55 S.Ct. 279, 79 L.Ed. 721 (1934). Furthermore, with respect to generic inventions, the patent law "does not require a description of all variations that might suggest themselves to one versed in the art." Hunt Co. v. Mallinckrodt Chemical Works, 177 F.2d 583, 585 (2d Cir.) (per L. Hand, J.); McCullough Tool Company v. Well Surveys, Inc., 343 F.2d 381, 395 (10th Cir. 1965), cert. denied, 383 U.S. 933, 86 S.Ct. 1061, 15 L.Ed.2d 851, rehearing denied, 384 U.S. 947, 86 S.Ct. 1452, 16 L.Ed.2d 545 (1966). "[T]he certainty which the law requires in patents is not greater than is reasonable, having regard to their subject-matter." Minerals Separation, Ltd. v. Hyde, 242 U.S. 261, 270, 37 S.Ct. 82, 86, 61 L.Ed. 286 (1916).

The patent before us does not disclose merely an improvement upon a prior art. Uniroyal's disclosure opened up a new art. It constituted a generic discovery of an entirely new use for an

15. E. g., "an invention must be capable of accurate definition, and it must be accurately defined, to be patentable," United Carbon Co. v. Binney & Smith Co., 317 U.S. 228, 237, 63 S.Ct. 165, 87 L.Ed. 232 (1942); "a patent is not a hunting license," Brenner v. Manson, 383 U.S. 519 534, 536, 86 S.Ct. 1033, 1042, 16 L.Ed. 2d 69 (1966); "a patent must be a cer-

tain guide; not a congeries of pregnant suggestions," Harries v. Air King Products Co., 183 F.2d 158, 160 (2d Cir. 1950); "A generic monopoly must rest upon a generic discovery," Helene Curtis Industries v. Sales Affiliates, 233 F.2d 148, 152 (2d Cir.), cert. denied, 352 U.S. 879, 77 S.Ct. 101, 1 L.Ed.2d 80 (1956).

existing composition. Prior to this disclosure there was no chemical known to man as being capable of inhibiting the growth of plants without injuring them. Dr. Naylor, who had been working with growth substances since 1936 and had screened between 1,600 and 1,800 chemical compounds on plants, testified that Uniroyal's disclosures of the composition's uses were outside his experiences with growth substances. After testing the composition on a variety of plants, he published an article in which he stated:

> "The response to maleic hydrazide of all eleven species tested is quite different from their response to any other known substance. This is true in degree and kind. Results thus far obtained show reaction to maleic hydrazide is remarkably uniform from species to species. Within the concentration range used the effects were strikingly similar for plants as distantly related as grasses, legumes, composites, and nightshades. With hormone-like compounds such uniformity in response is not encountered." Naylor and Davis, "Maleic Hydrazide as a Plant Growth Inhibitor," 112 The Botanical Gazette 112, 122 (Sept.1950) (Def's Ex. BA)

Others skilled in the art were similarly excited by the possible applications for the compound, once its new use had been disclosed, and a substantial amount of scientific endeavor was prompted by defendant's discovery. See fn. 9. Its practical commercial application to tobacco has been termed, by a grateful farmer, "a miracle." Claims and the specification with respect to such a basic discovery are entitled to liberal construction.

Ansul's contention that the specification here fails to support Claim 7 is based essentially on the fact that the patent discloses only nine examples, involving treatment of a few plant species with certain concentrations, salts and wetting agents in contrast to the countless varieties of salts, wetting agents, concentrations, dosage rates, etc. that might be required to make use of the disclosed invention in the treatment of the thousands of other plant species. Ansul argues that the disclosure is inadequate, since the same concentrations, timing and dosage rates will produce widely varying results in different plant species (ranging from no effect at all to killing), and changes in wetting agents, salts and other variables will also produce equally variable consequences.

■ The necessity for conducting experimentation or preliminary tests to determine the successful application of an invention, however, will not invalidate a patent, provided one skilled in the art could determine and select the necessary experiments or tests without unreasonable difficulty. As was long ago recognized in Mineral Separation Ltd. v. Hyde, 242 U.S. 261, 37 S.Ct. 82 (1916), the standard is one of reasonableness, having due regard to the nature of the invention and the state of the art. There the Supreme Court was faced with a claimed discovery relating to "improvements in the concentration of ores, the object being to separate metalliferous matter, graphite, and the like from gangue by means of oils, fatty acids, or other substances which have a preferential affinity for metalliferous matter over gangue." Mineral Separation v. Hyde, supra at 263, 37 S.Ct. at 83. In upholding the patent the Supreme Court stated:

> "Equally untenable is the claim that the patent is invalid for the reason that the evidence shows that when different ores are treated preliminary tests must be made to determine the amount of oil and the extent of agitation necessary in order to obtain the best results. Such variation of treatment must be within the scope of the claims, and the certainty which the law requires in patents is not greater than is reasonable, having regard to their subject-matter. The composition of ores varies infinitely, each one presenting its special problem, and it is obviously impossible to specify in a patent the precise treatment which would be most successful and econom-

ical in each case. The process is one for dealing with a large class of substances and the range of treatment within the terms of the claims, while leaving something to the skill of persons applying the invention, is clearly sufficiently definite to guide those skilled in the art to its successful application, as the evidence abundantly shows. This satisfies the law." (pp. 270–271, 37 S.Ct. p. 86)

Like the "ores" in *Mineral Separation Ltd.*, the wide variety of "plants" that can be effectively treated with MH dictates that if this remarkable new generic discovery was to be given any meaningful patent protection, it would be necessary to allow a fairly broad claim, even though "a skilled man might find it necessary to make several tests or trials of before arriving at success," A. B. Dick Co. v. Barnett, 288 F. 799, 801 (2d Cir. 1923). "[T]he existence of an inescapable area of uncertainty is not sufficient justification for denying to the patentee the fruits of his invention," Georgia-Pacific Corp. v. United States Plywood Corp., *supra* 258 F.2d at 136. Our task, therefore, is to decide whether the "language is as precise as the subject matter permits," *id.* at p. 136, and whether the "area of uncertainty" is so excessive as to place an unreasonable burden upon one skilled in the art who seeks to apply the discovery in a specific situation.

Demonstrating outstanding skill as a trial lawyer, Ansul's counsel adduced much evidence with respect to the 916 patent's uncertainties, its paucity of detail, and specific problems faced in attempting to practice the invention, all of which tended to show that extensive exploratory experimentation involving replication of treatments was required, in view of the variable biological responses of different plants and even of the same plant at different growth stages. This evidence fell into two main categories: (1) opinion testimony by experts who had not themselves engaged in broad experimentation, and (2) experience recorded in Uniroyal's files, principally in the form of correspondence with the many independent research workers to whom Uniroyal sent samples of MH with instructions in an effort to gain additional knowledge as to possible practical commercial uses for the product.

In general Ansul's experts were of the opinion that the information furnished in the 916 patent was wholly inadequate to enable one skilled in the art to select and determine, out of countless possibilities, the concentration, dosage rate, timing, salt and wetting agent that would produce a desired result in the MH treatment of a particular species or variety of plant. Dr. Wayne C. Hall, for instance, a plant physiologist who tested MH on a very limited basis (and without using the 916 patent as a guide), found that it had varying effects on different species of grasses, inhibiting the growth of some, killing others, and turning one species (St. Augustine) yellow;[16] and that MH was not suitable for preventing sucker re-growth in cotton, although it was found to reduce such regrowth when used in concentrations above 3,000 p. p. m. Furthermore, as he reads the 916 patent, it teaches only the inhibition of primary growth (i. e., growth in height of a plant, from the apical meristem), and not of secondary growth (i. e., lateral growth from the axillary buds), which is distinct in the field of plant physiology, since the examples in the patent were all young plants that had not yet reached the stage where they would have secondary or axillary growth. He further criticized examples in the 916 patent as not having been conducted according to recognized scientific procedure because data was based on experiments with a single plant whereas the proper basis would be treatment of several plants, in view of normal biological variability. As for the com-

16. Dr. Hall's testimony was to some extent inconsistent with Ansul's instructions on its own brand of MH, called "Retard," to the effect that the product is used "for controlling growth of grass, trees, shrubs and ivy."

mercial success experienced in controlling tobacco plant suckers and sprouting in potatoes and onions, Dr. Hall noted that no mention is made of tobacco, potatoes or onions in the 916 patent, and there is no disclosure of the procedure to be followed in treating them.

Ansul's expert in the field of chemistry, Dr. Herman B. Wagner, also opined (without any actual experience in testing MH salts) that certain salts of the dione would be inoperative in producing the results claimed by the patent, since such salts would not function biologically, or they would even be antagonistic to the dione (e. g., mercury salt). Similar expert opinion was introduced to the effect that not all wetting agents would function with MH, some of them being biologically incompatible with it. It was further shown that under arid conditions MH acts erratically.

Memoranda, reports, and correspondence from Uniroyal's files dating back to the early MH testing period were offered to show that there was a time when some plant physiologists believed that certain plants (e. g., cotton, peas, beets, carrots and cabbage) were not affected by or susceptible to MH at all. Furthermore, although MH was originally visualized as useful in dwarfing fruit trees, side effects rendered it useless for this purpose, and it was found to have an adverse effect on some crops.

In reply, Uniroyal offered expert testimony and experimentation records showing that the difficulties posed by Ansul are grossly exaggerated and that one skilled in the art, once armed with the knowledge disclosed by the patent, could apply its teachings to any plant species by following routine testing procedures and experiments usually required to determine the most successful treatment for a particular plant.

 After careful review and appraisal of the evidence offered by both sides, we are persuaded that the disclosures of the 916 patent, while perhaps meager in some respects, were adequate to support Claim 7. We start with the established fact that at the time when the 916 patent issued it was generally recognized by those skilled in the art that different plant species, and even different varieties within a given species, would have differing sensitivities to a given chemical such as MH; that a plant's response would vary with changes in concentration and timing; that some plants would (because of their well known tougher cellular composition or waxier surface) require wetting agents and salts that would penetrate more effectively than those required by others; and that while some salts, wetting agents and methods could technically fall within the scope of the 916 patent, they would not normally be used for the purpose disclosed by one skilled in the art to which the patent is directed. Ansul underestimates the state of the art known to the plant physiologist seeking to apply the patent's teachings. The patent revealed that the compound was effective on the two broad plant classifications, the broad leafed or dicots, and the narrow leafed, or monocots. It did not limit the disclosure to inhibition of primary growth. It referred simply to "growth," which would encompass both primary and secondary, and its examples contemplated inhibition of both. It disclosed measurements of primary growth of tomatoes, and referred to inhibition of flowering and fruiting, which is secondary growth. Although it did not specifically refer to potatoes, onions or tobacco, it did refer to tomatoes which are of the same family, the solansceae (nightshade).

The ultimate answer to Ansul's contention lies in the testing conducted by research personnel to whom Uniroyal furnished samples of the MH compound with disclosures as to its new use. With astonishing rapidity they used the new discovery and teachings in routine experiments, featuring routine screening techniques, to develop practical uses for the product. None of this would have occurred, of course, if it had not been for Uniroyal's disclosure of the basic

secret with sufficient information for researchers to use the compound in their regular sampling procedures. Dr. Naylor, who used the chemical to inhibit the growth of tobacco suckers, had no trouble applying MH for this purpose once Uniroyal provided him with the chemical and disclosed that it could be used to inhibit the growth of plants. As one skilled in the art, and interested in the problem of tobacco suckering, he immediately saw the chemical's use for solving that problem. After Uniroyal's disclosure all that Dr. Naylor needed to do to refine the use was to have his undergraduate class run routine screening tests.

Dr. Wittwer, who developed the other major commercial use for the compound, prevention of sprouting of onions, likewise encountered no difficulty in applying MH toward this end after Uniroyal disclosed to him that the composition could inhibit the growth of plants. He testified that his "first experiment was a perfect experiment" and that since that experiment nothing new has been learned about treating onions with this chemical to prevent sprouting.

In the face of such substantial evidence of the minor experimentation needed to perfect the use of the compound, once its generic use had been disclosed, we find that the specification of the 916 patent reasonably "enable[s] any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same * * *", 35 U.S.C. § 112, and that it adequately supports Claim 7, which claims the method for treatment of growing plants with the dione "and its salts in a concentration and amount sufficient to alter the growth characteristics of said plants." See Binks Mfg. Co. v. Ransburg Electro-Coating Corp., 281 F.2d 252, 256–257 (7th Cir. 1960); Merck & Co. v. Chase Chemicals Co., 273 F.Supp. 68, 75 (D.N.J.1967); Yosemite Chemical Company v. United States, 175 Ct.Cl. 623, 360 F.2d 948, 951–952 (1966).

■ Ansul's contention that the language of Claim 7 is so broad as to constitute invalid overclaiming must also be rejected. The Patent Office specifically required the patentee to use the words "in a concentration and amount sufficient," believing that these words would cure the claim which, without them, had been rejected as too broad. Admittedly the term "growth characteristics," could cover growth promotion as well as inhibition and, unlike the language used to teach the method of application, the description could have been limited to exclude such a possible effect. But growth inhibition is not the composition's only effect, it also can be used to prevent growth, kill, or cause formative effects. Under such circumstances, it cannot be said that the claim was "intentionally drafted to obtain a statutory monopoly broader than seems to be justified." Georgia-Pacific Corp. v. United States Plywood Corp., 258 F.2d 124, 135 (2d Cir.), cert. denied, 358 U.S. 884, 79 S.Ct. 124, 3 L.Ed.2d 112 (1958). In light of our conclusions, *supra*, as to the generic character of this invention, it appears to us more logical to limit the ambiguous term "growth characteristics" by the specification's disclosures, which in no way indicate to one skilled in the art that the composition is capable of growth promotion.

■ It is true that the term "salts" in Claim 7 covers an infinite number of compounds, not all of which have been shown to be operative with the dione; and there was evidence to the effect that the mercury salt of maleic hydrazide does not possess growth inhibition activity. On the other hand, those skilled in the art to which the patent is directed would *not expect* all of the possible salts of the dione to be operative for the purposes disclosed in Claim 7, and many would be excluded as a matter of common knowledge in the art. The fact that a claim may include salts that are inoperative for the uses claimed does not necessarily call for its invalidation. Yosemite Chemical Company v. United States,

175 Ct.Cl. 623, 360 F.2d 948, 951–952 (1966). The law is not blind to the problems faced by a patentee in a situation of the type presented here. Against the policy in favor of precise claiming we must balance that encouraging early disclosure, particularly of major developments. If we were to hold Claim 7 invalid because of the use of the term "salts," this advance in the art would probably still be undisclosed because of the infinite number of salts that the patentee would have to test before being willing to make his disclosure. On the other hand, the evidence amply indicated that those skilled in the art had no difficulty in relying on their skill to determine which salts of the dione they should use. No substantial or difficult experimentation was required for this purpose; the specification served as an effective teacher and it was well known in the art that certain salts would be toxic or prevent absorption of the dione by the plant. Consequently, as to those to whom the patent was directed, the term "salts" was not too broad. Under such circumstances, "[t]he inventor is not to be deprived of the fruits of his labor by too technical a requirement of disclosure, and it is adequate for purposes of validity if his claims are sufficiently clear and exact to be understandable by those skilled in the relevant art." Yosemite Chemical Company v. United States, supra at 952.

If Claim 7 had been limited to a few specific salts, as Ansul argues that it should have been, we would apply the doctrine of equivalents to prevent an infringer from using another salt of the dione for the purposes disclosed in the patent. It would be anomalous, therefore, to strike down this patent because it broadly claims an area which, if narrowly claimed, would have been the subject of a grant of monopoly to the patentee under the doctrine of equivalents. Georgia-Pacific Corp. v. United States Plywood Corp., 258 F.2d 124, 137 (2d Cir.), cert. denied, 358 U.S. 884, 79 S.Ct. 124, 3 L.Ed.2d 112 (1958).

*The Discoveries of Drs. Naylor, Wittwer and Crafts*

Ansul next argues that Claim 7 is invalid under 35 U.S.C. § 102(g) as an attempted appropriation of the discoveries of Drs. Naylor, Wittwer and Crafts, three plant physiologists to whom samples of defendant's product had been sent just prior to the filing of the patent application in April of 1949. In conjunction with this argument Ansul also argues that as the patent does not mention what have become the major commercial uses of maleic hydrazide, controlling the suckering of tobacco and the sprouting of potatoes and onions, then the patent cannot be construed to cover these uses. These arguments are without merit.

Merely because the patent does not specifically refer to tobacco, onions or potatoes, Uniroyal does not lose patent rights with respect to treatment of these plants, since the patent discloses a basic invention. Dr. Naylor, who developed the use of maleic hydrazide on tobacco and who was defendant's expert witness in this proceeding, conceded that he extended and applied what was disclosed to him by Uniroyal when it provided him with a free sample of the product and a description of its "growth regulant" properties. Dr. Wittwer's application of MH to onion sprouting was also but a logical extension thereof. If the patent's claims had been limited to MH's effect on tomatoes (the original plant upon which its unique properties were observed), we would have applied the doctrine of equivalents to find that the patent also covered the use of the product for growth regulation on tobacco, onions and potatoes. Consequently, what may be called the doctrine of "reverse equivalents," under which the broader claim includes the lesser subject matter, would apply in this case to place the uses of the composition on these latter plants within the patent's protection. See Georgia-Pacific Corp. v. United States Plywood Corp., 258 F.2d 124, 137 (2d Cir.), cert. denied, 358 U.S. 884, 79 S.Ct. 124 (1958).

Even accepting *arguendo* Ansul's argument that the original April 1, 1949 filing date was abandoned in favor of July 20, 1949 (the date of filing of the continuation-in-part) as the presumed date of invention, the actual invention predated April, 1949. Uncontradicted testimony and records of defendant provided convincing evidence that the unique properties of MH were first discovered by Uniroyal's scientists in December of 1947. Thus the date of invention preceded the March, 1949 "sampling" of the product to numerous plant physiologists. At about the same time as the sampling, Uniroyal sent to these same scientists a paper by Hoffman and Schoene entitled "MALEIC HYDRA-ZIDE, A UNIQUE GROWTH REGULANT," which made the generic disclosures that provided the impetus to the three developments or extensions now urged by plaintiff as prior inventions. Upon all of the evidence we find that the generic invention was made by Uniroyal's scientists prior to March, 1949. See Rooted Hair, Inc. v. Ideal Toy Corp., 329 F.2d 761, 767 (2d Cir.), cert. denied, 379 U.S. 831, 85 S.Ct. 63, 13 L.Ed.2d 40 (1964). Since Dr. Naylor's application of MH to tobacco did not occur until April 19, 1949 (though he may have conceived the experiment in late March of that year) and his discovery was well within the scope of the patentee's disclosures, his application of the disclosures can in no way be said to invalidate Claim 7.

Dr. Crafts, a short time prior to May 20, 1949, found that the composition had phytocidal (herbicidal) properties. Though it may be argued that Uniroyal did not specifically claim and disclose these properties in its original April, 1949, patent application, defendant first discovered MH's herbicidal use. In his original report on the discovery of the chemical's use, Dr. Tate listed it under "Herbicides." Tests begun by Uniroyal in 1948, which were not completed until early April 1949, revealed its phytocidal properties and this is confirmed by Hoffman's letter of April 19, 1949, warning experimenters that the chemical could kill grasses when used in certain concentrations. We find that Uniroyal's scientists first discovered these properties, which were not at all surprising to those skilled in the art in light of defendant's first disclosures, and that Uniroyal did not wrongfully appropriate the findings of Dr. Crafts.

Ansul next argues that Claim 7 must be invalidated on the ground that Dr. Wittwer was the first to conceive of the idea of using MH to *permanently* prevent the sprouting of onions in storage. It is true that the instruction sheet sent by Uniroyal to Dr. Wittwer in March of 1949 emphasized that the composition had a *temporary* inhibiting effect on plant growth, and thereafter he started experimenting with onions before Uniroyal, in its July 20, 1949 continuation-in-part application, disclosed that MH could "be used to *prevent* growth." But Uniroyal's early March, 1949, paper pointed out that "[t]he length of inhibition period appears to be directly proportional to the concentration used." Furthermore, the novelty of the inventors' original discovery and breadth of their disclosures were sufficient to embrace Dr. Wittwer's minor variation and application of MH [17] to onions.

An inventor who discovers a basic new use is not required specifically to disclose, or even be aware of, all the

17. Though Dr. Wittwer testified that he conceived of experimenting with the use of MH on onions in the spring of 1949, shortly after receiving the sample and disclosure from defendants, no evidence was presented indicating that at that time he knew the chemical composition would permanently inhibit the sprouting of onions. He did not apply the chemical to the onions until mid-August, 1949, well after patentee's July patent application which specifically disclosed growth prevention. Not until March 2, 1950 can it be said that Wittwer observed that MH had prevented sprouting on onions. Until that date it cannot be said that Dr. Wittwer had any more of a "conception" about the utility of MH for this purpose than he did about the many other chemicals he had tested for sprout prevention.

uses of his invention. B. G. Corporation v. Walter Kidde & Co., Inc., 79 F.2d 20, 22 (2d Cir. 1935). Despite the discoveries by others of variations on the patentee's invention, the significant invention will receive patent protection to encourage the type of sampling and disclosures which occurred here. Patents are granted to encourage the ready availability of new knowledge to the public. If defendant were to lose his patent in this case because of his disclosures, we would be defeating the very policy behind the patent laws. We find that the validity of Claim 7 is in no way affected by Dr. Wittwer's experiments.

*The 916 Patent Covers MH–30*

■ The parties have stipulated that if Claim 7 is held valid (and we so hold), it will be deemed infringed by plaintiff and plaintiffs-interveners if it is also found to cover Uniroyal's commercial product MH–30. Ansul contends that it does not because Uniroyal's commercial product largely consists, as does Ansul's, of a salt of 6–hydroxy–3(2H)–pyridazinone (6 hydroxy) while Claim 7 relates to the use of the dione and its salts. However, since we find that the patent properly claimed 6–hydroxy as well as the dione, Claim 7 has been infringed.

The empirical formulas for the dione and the 6–hydroxy are identical, $C_4H_4$

$N_2O_2$. See fn. 1. Consequently, these two compounds are what is known in the chemical art as isomers. Though isomers have different structural formulas and can be distinctly different compounds, some isomers spontaneously convert into other isomers until a composition that originally could be identified as one compound has reached an equilibrium mixture of the original compound and an isomer thereof. When isomers behave in this fashion, they are known in the art as tautomers. The phenomenon of intraconversion between two or more isomers which reach an equilibrium mixture where all are present in proportions determined by nature is known as tautomerism. It is a phenomenon that has been known to the chemical art since approximately 1910.

Uniroyal contends that though Claim 7 of the patent refers to the dione, it also covers the 6–hydroxy because the first column of the patent discloses to those skilled in the art that the term dione is being used interchangeably to refer also to the 6–hydroxy. The relevant portion of the 916 patent reads:

The 1, 2 dihydropyridazine–3, 6 dione may be designated by the di-keto form, or the mono-keto form, or the mono-keto mono enol form, or the di-enol form of structural formula, respectively, as follows:

It may be obtained by reacting maleic anhydride and hydrazine according to the procedure of Curtius and Foersterling, J. Pr. Chem. (2) 51, 371–398 (1895).

The structural formula on the left is the dione. The center formula is the structural formula for the 6-hydroxy. As is apparent these two molecules are isomers with only minor variations in bonding and atomical arrangement. The words "keto" and "enol" used in the above portion of the patent are terms of art used by chemists when referring to tautomers. A keto form of structure would refer to a carbonyl group ("O" group), and di-keto would mean a structural form with two carbonyl groups, such as the dione structure. An enol group is an hydroxy ("OH") group, and a "mono-keto mono enol form" would refer to a structural form with one carbonyl and one hydroxy group, such as the 6–hydroxy structure. Thus the patent specifically called to the attention of those skilled in the art that when it spoke of the dione it was using the term to denote the three structural formulas shown above as well as the reaction product, MH, which is obtained by following the Curtius and Foersterling procedure.[18] It is not unusual, when speaking of tautomers, to refer to all structures by one chemical name, such as the dione, since it is not possible to give a proper chemical name to a tautomeric mixture which, by its nature, contains compounds of more than one molecular structure. Another way of referring to a tautomer is by a common or colloquial name, such as "maleic hydrazide." See fn. 2.

When Uniroyal first began the commercial sale of MH, it referred to the product by that common name and by the proper chemical name, dione. As Uniroyal became more familiar with MH, it concluded that a more accurate proper chemical name for MH would be the 6-hydroxy. Experimentation had shown that at equilibrium more of the 6-hydroxy was present than the dione. Ansul also characterizes its product as the 6-hydroxy.

Uniroyal disclosed the 6–hydroxy, and thus encompassed it within Claim 7, by using the term dione and indicating in the specification that the claimed chemical composition covered tautomers, including the dione and 6–hydroxy. When a patentee so defines terms

"[T]here is thus a clear antecedent basis in the specification for the language used in the claims, and the sense in which the claims are to be construed is apparent. Within *reasonable* limits an applicant is his own lexicographer and words used in his claims are to be interpreted in the sense in which they are used in the specification." Application of Rohrbacher, 284 F.2d 531, 533 (C.C.P.A.1960) (Emphasis added)

Uniroyal's definition was reasonable. The evidence established to our satisfaction that the dione and 6–hydroxy are tautomers (and therefore, for all practical purposes, one and the same) and that they are identical to the major components of Ansul's products. Accordingly we find that Ansul and plaintiffs-interveners have infringed a valid claim (Claim 7) of the 916 patent.

The above constitutes the Court's findings of fact and conclusions of law pursuant to Rule 52(a), F.R.C.P. Trial of the antitrust and misuse issues will commence promptly on Tuesday, July 1, 1969, at 10:00 A.M.

It is so ordered.

---

18. Foersterling originally identified the structure he obtained as the dione, but when he published with his professor, they used the name maleic hydrazide. The Curtius publication revealed that MH (identified by the dione structure) was not the only reaction product obtained by allowing hydrazine hydrate to react with maleic anhydride. The Curtius reference admits that the constitution of other hydrazine compounds obtained from maleic anhydride and hydrazine hydrate is "still unclarified." Note that Foersterling's and Curtius' work occurred approximately 15 years prior to the art's general recognition of the existence of tautomers.